*12m-5135-JGD*

## AFFIDAVIT OF FBI SPECIAL AGENT THOMAS KING

I, Thomas F. King, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed by the FBI for approximately fifteen years. Prior to joining the FBI, I worked as a police officer for the Worcester, Massachusetts, Police Department, attaining the rank of Detective Sergeant.

2. During my career as a police officer as well as during my tenure with the FBI, I have participated in investigations relating to the distribution of controlled substances including cocaine, cocaine base (also known as "crack cocaine"), and other illegal drugs. I have received training in the area of narcotics investigations. I have been the affiant on affidavits in support of search warrants, arrest warrants, and other applications.

3. This affidavit is submitted in support of an application for a criminal complaint charging **JORDAN JORGE** and **FELICIA TIMOTEO** with conspiracy to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

4. I am familiar with the underlying investigation. I have also reviewed reports and spoken with other agents and officers who participated in the investigation of **JORGE** and **TIMOTEO** during this time period.

5. This affidavit does not set forth all the facts developed during the underlying investigation. Rather, it sets forth facts I believe sufficient to establish probable cause to believe that **JORGE** and **TIMOTEO** committed the crime set forth in the accompanying criminal complaint.

6. From 2010 to the present, I have been involved in an investigation of the Latin Kings, a violent street gang, in New Bedford, Massachusetts. This investigation was conducted by a Task Force of agents from the FBI, the Massachusetts State Police, the New Bedford Police Department, and other law enforcement agencies.

7. To help conduct the investigation, the Task Force utilized a cooperating witness (hereinafter, "CW-2") to make controlled purchases of narcotics from a number of different targets, including **JORGE** and **TIMOTEO**. During the course of the investigation, agents directed CW-2 to place consensually recorded telephone calls to targets of the investigation. During these recorded phone calls, a type and quantity of drugs was discussed and a price was negotiated. CW-2 then met with members of the Task Force in preparation for conducting a controlled purchase of narcotics.

8. Before every controlled purchase conducted during this investigation, including the controlled purchases described below, Task Force agents met with CW-2, searched CW-2 for money and contraband, gave CW-2 official government currency (OGC) to

buy the drugs, provided CW-2 with an audio and video recording device to record the sale, and provided CW-2 with a device that allowed the agents to listen to the meeting between CW-2 and the target in real time. Task Force agents then directed CW-2 to meet with the target. Whenever possible, agents monitored CW-2 to and from the buys. After each buy, agents met CW-2 at a predetermined location. CW-2 turned over the drug evidence purchased, the recording devices, and any unused official funds. CW-2 was searched again and debriefed by Task Force agents. Finally, Task Force agents reviewed the video and audio recording of the controlled purchase of narcotics.

9. On April 13, 2012, agents directed CW-2 to place a consensually recorded telephone call to **JORDAN JORGE, a/k/a "J-Rock,"** a New Bedford Latin King, at 774-400-6323, the phone CW-2 advised was used by **JORGE**. During the phone call, CW-2 and **JORGE** discussed quantities and prices for future drug sales. On April 18, 2012, agents directed CW-2 to again call telephone number 774-400-6323 and set up a purchase of crack cocaine. During the recorded phone call, CW-2 ordered crack cocaine. In a subsequent recorded call, **JORGE** told CW-2 to meet him at the Costa's Mini Mart on Sawyer Street in New Bedford.

10. Pursuant to the procedures discussed above, I searched CW-2, equipped CW-2 with a video recording device, and provided CW-2 with $300 in OGC. I then directed CW-2 to go to the Costa's

Mini Mart and attempt to purchase crack from **JORGE**.

11. At 5:33 p.m., CW-2 began walking to Costa's Mini Mart. Agents who had set up surveillance in the vicinity of Costa's Mini Mart observed **JORGE** and a woman, later identified as **TIMOTEO**, walking from the area of 442 Sawyer Street toward the store. Agents saw CW-2, **JORGE**, and **TIMOTEO** enter the store. They went to the back of the store. While inside, they had the following conversation (the conversation flipped back and forth between English and Spanish, and the Spanish was translated by a court-certified interpreter):[1]

| | |
|---|---|
| JORGE: | Grab what you want. |
| CW-2: | Don't do it now, whatever. Over here. Hey. So how much, the three, or two or . . . |
| JORGE: | Three. |
| CW-2: | (counting) One, two, three, four, five, six, seven, eight, nine, ten. Here, papi. |
| JORGE: | You can count it right there. |
| CW-2: | Sure. Oh, shit. Yeah, but [unintelligible] over here! |
| JORGE: | No? |
| CW-2: | No, no, no, no, no! So, I paid you what I owed you. What happened? |
| JORGE: | Here's my girl, get it from my girl. |

---

[1] The transcripts are still in draft form.

CW-2:          Yeah, OK, I don't need to hurry.  Hey, you know what?  Put it somewhere and I'll grab it.  Put it somewhere.

12.  Based on a view of the video recording, **JORGE** then walked to the cashier in the front of the store and appeared to distract him:  "Yo, I wanted this right here."  As **JORGE** spoke to the store clerk, **TIMOTEO** walked up to CW-2.  CW-2 softly asked **TIMOTEO**, "Got it?", and **TIMOTEO** replied softly, "Mmm, hmm."  **TIMOTEO** and CW-2 then turned to go back toward the back of the store where **TIMOTEO** handed the crack cocaine to CW-2.

13.  After **TIMOTEO** handed CW-2 the crack, CW-2 turned around and headed for the front exit to the store.  CW-2 shouted to **JORGE**, "Hey!  I'm gonna call you back," and left the store.  CW-2 proceeded to a predetermined meeting location where it handed in the recording equipment and a package which, based on its color, odor, and texture, appeared to be crack cocaine.  Agents conducted a field test of the substance in the bag which tested positive for the presence of cocaine.  The bag has been sent to the Drug Enforcement Administration for analysis but an analysis has not yet been completed.

14.  After the buy, CW-2 was shown a single photograph of **JORDAN JORGE, a/k/a "J-Rock,"** with no identifying information present.  CW-2 positively identified **JORGE** as one of the two people from whom CW-2 purchased crack cocaine.  On April 26,

2012, CW-2 viewed a single photograph of **TIMOTEO** with no identifying information present. CW-2 identified **TIMOTEO** as the other person from whom CW-2 purchased the cocaine. Several agents who watched the video recording of the meeting identified **JORGE** and **TIMOTEO** as the persons who sold crack to CW-2. Agents also photographed **JORGE** and **TIMOTEO** as they left the store together.

15. Based upon the foregoing, I submit there is probable cause to believe that on April 18, 2012, **JORDAN JORGE, a/k/a "J-Rock,"** and **FELICIA TIMOTEO** conspired to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

Signed under the pains and penalties of perjury this 7th day of June, 2012.

_____
THOMAS F. KING
Special Agent
federal Bureau of Investigation

Sworn to and subscribed before me this 7th day of June, 2012.

_____
HON. JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE